IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CASE NO.

| | |
|---|---|
| Julie Cook, on behalf of herself and all others similarly situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>Nvidia Corporation; ATI Technologies, Inc.; and Advanced Micro Devices, Inc.<br><br>　　　　　　　　　　Defendants. | **COMPLAINT**<br>(Jury Trial Requested)<br>(The Sherman Act; Violation of South Carolina Consumer Protection and Unfair Competition Laws; Unjust Enrichment and Disgorgement of Profits) |

　　　　　Plaintiff, by her attorneys, brings this civil action for damages and injunctive relief on behalf of herself and all others similarly situated against the above-named Defendants, and demanding a trial by jury, complains and alleges as follows:

**JURISDICTION AND VENUE**

　　　　　1.　　　This complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages under South Carolina state antitrust and common laws, and to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of the Defendants' violations of those laws.

　　　　　2.　　　The Court has jurisdiction over the federal claim under 28 U.S.C. §§ 1331 and 1337. The Court has jurisdiction over the South Carolina state law claims under 28 U.S.C. § 1367 because those claims are also related to the federal claim that they form part of the same case or controversy. The Court also has jurisdiction over the South Carolina state law

7251

claims under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the defendants.

3. Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

4. The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States:

    a. Defendants and their co-conspirators participated in a continuous and uninterrupted flow in interstate commerce to customers located in South Carolina;

    b. Defendants and their co-conspirators sold and shipped substantial quantities of Graphics Processing Units and Cards to customers located in South Carolina;

    c. Data, information, correspondence and financial material were exchanged between customers located in South Carolina and the Defendants and their co-conspirators; and/or

    d. Money flowed between banks in South Carolina and the Defendants and their co-conspirators.

5. The Defendants (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority, including each other as co-conspirators) have:

a. Transacted business in South Carolina;

b. Contracted to supply or obtain services or goods in South Carolina;

c. Intentionally availed themselves of the benefits of doing business in South Carolina;

d. Produced, promoted, sold, marketed or distributed their products or services in South Carolina and, thereby, profiting from their access to the markets in South Carolina;

e. Caused tortious damage by act or omission in South Carolina;

f. Caused tortious damage in South Carolina by acts or omissions committed outside of South Carolina while (i) regularly doing or soliciting business in South Carolina, and/or (ii) engaging in other persistent courses of conduct within South Carolina and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in South Carolina; and

g. Committed acts and omissions that Defendants knew or should have known would cause damage (and, in fact, did cause damage) in South Carolina to Plaintiff and members of the Class while (i) regularly doing or soliciting business in South Carolina, and/or (ii) engaging in other persistent courses of conduct within South Carolina and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in South Carolina.

## DEFINITIONS

6. As used herein, the term "Graphics Processing Units and Cards" refers to highly specialized semiconductors and related products that increase the speed, complexity

and visual fidelity of digital images that can be displayed on graphical interfaces.

7.  As used herein, the term "Class Period" means the time period between November 30, 2002 and the present.

## THE PARTIES

### The Plaintiff

8.  Plaintiff Julie Cook, a resident of South Carolina, indirectly purchased a Graphics Processing Unit and Card from one or more of the Defendants during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

### The Defendants

9.  Defendant Nvidia Corporation ("Nvidia") is a business entity organized under the laws of Delaware, with its principal place of business at 2701 San Tomas Expressway, Santa Clara, California 95050. During the time period covered by this Complaint, Defendant Nvidia manufactured, sold and distributed Graphics Processing Units and Cards to customers throughout the United States. Nvidia earned $2.375 billion in revenues in 2005.

10.  Defendant ATI Technologies, Inc. ("ATI") is a Canadian corporation with its principal place of business located at 1 Commerce Valley Drive East, Markham, Ontario, Canada L3T 7X6. During the time period covered by this Complaint, Defendant ATI manufactured, sold and distributed Graphics Processing Units and Cards to customers throughout the United States. ATI earned $2.222 billion in revenues in 2005.

11.  Defendant Advanced Micro Devices, Inc. ("AMD") is a Delaware Corporation with its principal place of business located at One AMD Place, P.O. Box 3453, 12 Sunnyvale, California 94088-3453. On July 24, 2006 AMI and ATI announced a plan to merge together in a deal valued at US $5.4 billion. The merger closed October 25, 2006. The acquisition

7251

consideration included over $2 billion financed from a loan, as well as 56 million shares of AMD stock. During the time period covered by this Complaint, through its acquisition of Defendant ATI, Defendant AMD manufactured, sold and distributed Graphics Processing Units and Cards to customers throughout the United States.

**Co-Conspirators**

12. Various others, presently unknown to Plaintiffs, participated as co-conspirators with the Defendants in the violations of law alleged in this Complaint and have engaged in conduct and made statements in furtherance thereof.

13. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's business or affairs.

14. Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

15. Plaintiff brings this suit as a class action pursuant Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and a Plaintiff Class ("the Class") composed of and defined as follows:

> All persons and entities residing in the United States who, from November 30, 2002 to the present, purchased computer Graphics Processing Units and Cards in the United States indirectly from the Defendants for their own use and not for resale. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and *any* affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the

7251

members of his/her immediate family and judicial staff, and any juror assigned to this action.

16. This action has been brought and may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

    a. The Class is ascertainable and there is a well-defined community of interest among the members of the Class;

    b. Based upon the nature of the trade and commerce involved and the number of indirect purchasers of Graphics Processing Units and Cards, Plaintiffs believe that the members of the Class number in the thousands, and therefore is sufficiently numerous that joinder of all Class members is not practicable;

    c. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff indirectly purchased Graphics Processing Units and Cards from one or more of the Defendants or their co-conspirators, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class;

    d. The following common questions of law or fact, among others, exist as to the members of the Class:

        i. whether Defendants formed and operated a combination or conspiracy to fix, raise, maintain or stabilize the prices of, or allocate the market for, Graphics Processing Units and Cards;

        ii. whether the combination or conspiracy caused Graphics Processing Units and Cards prices to be higher than they would have been in the absence of Defendants' conduct;

7251

   iii. the operative time period of Defendants' combination or conspiracy;

   iv. whether Defendants' conduct caused injury to the business or property of Plaintiff and the members of the Class;

   v. the appropriate measure of the amount of damages suffered by the Class;

   vi. whether Defendants' conduct violates Section 1 of the Sherman Act;

   vii. whether Defendants' conduct violates Wis. Stat. §§ 133.01, 133.03 and 133.18; and

   viii. the appropriate nature of class-wide equitable relief.

 e. These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class;

 f. After determination of the predominate common issues identified above, if necessary or appropriate, the Class can be divided into logical and manageable subclasses;

 g. Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff has no interests that are antagonistic to other members of the Class and has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent herself and the Class;

 h. A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical. The damages suffered by

      individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent the availability of class action procedures, it would not be feasible for Class members to redress the wrongs done to them. Even if the Class members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court;

i. Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

j. In the absence of a class action, Defendants would be unjustly enriched because they would be able to retain the benefits and fruits of their wrongful conduct;

## NATURE OF TRADE AND COMMERCE

17. Throughout the period of time covered by this Complaint, Defendants and their co-conspirators engaged in the business of marketing and selling Graphics Processing Units and Cards throughout the United States.

18. Nvidia Corporation states on its website that it is the "worldwide leader in programmable graphics processor technologies." (<http://phx.corporate-

7251

ir.net/phoenix.zhtml?c=116466&p=irol-homeprofile>) It further states that it creates products for computing, consumer electronics, and mobile device applications. In its most recent form 10-Q, filed with the United States Securities and Exchange Commission on November 29, 2006, Nvidia stated that it has four major product-line operating segments: the graphics processing unit, or GPU, Business; the media and communications processor, or MCP, Business; the Handheld GPU Business, and the Consumer Electronics Business.

19. Nvidia further stated that its GPU Business is composed of products that support desktop personal computers, or PCs, notebook PCs and professional workstations. Its MCP Business is composed of NVIDIA nForce products that operate as a single-chip or chipset that can off-load system functions, such as audio processing and network communications, and perform *these* operations independently from the host central processing unit, or CPU. Nvidia's Handheld GPU Business is composed of products that support handheld personal digital assistants, cellular phones and other handheld devices. Its Consumer Electronics Business is concentrated in products that support video game consoles and other digital consumer electronics devices including Sony's PlayStation3 and Microsoft's Xbox360 videogame consoles.

20. The Nvidia GPU and MCP brands include Nvidia GeForce®, Nvidia GoForce™, Nvidia Quadro®, and Nvidia nForce™. Nvidia's product applications include video games, film production, broadcasting, industrial design, space exploration, and medical imaging. Nvidia further states that "The world's leading PC and Handset OEMs [Original Equipment Manufacturers] incorporate Nvidia technology into their products, including Apple, Dell, Fujitsu Siemens, Gateway, HP, IBM, Lenovo, LG, Medion, Mitsubishi, Motorola, MPC, NEC, Samsung, Sony Electronics, Sony Ericsson, and Toshiba." Nvidia further states that it "partners with a broad range of system builders, such as Alienware, Falcon Northwest, HCL, SAHARA and Shuttle, to

7251

deliver solutions at every price point." Additionally, Nvidia products have been adopted by the world's leading add-in card and motherboard manufacturers, including ASUS, BFG, SVGA, Foxconn, GIGABYTE, MSI, Palit, Point of View, and XFX.

21.   Defendant ATI stated in its 2005 Annual Report that it is one of the world's leading providers of graphics processors and technologies. It further stated that "Our graphics processing units (GPUs) are highly specialized semiconductors that increase the speed, complexity and visual fidelity of digital images that can be displayed on graphical interfaces." ATI further stated that its products are found in desktop and notebook computers, and consumer electronics devices such as mobile phones, digital televisions and game consoles.

22.   ATI's two primary markets for its semiconductor graphics products are the PC and Consumer markets, and in the first quarter of fiscal 2005 it began to report its financial results in two segments, PC and Consumer. Its PC segment includes all 3D graphics, video and multimedia products, and chipsets developed for use in desktop and notebook computers, including professional workstations, servers and home media PCs. Its consumer segment includes products used in mobile phones, PDAs, DTVs and consumer electronics. In the PC segment, ATI's desktop GPU primary brands include Radeon (desktop products), FireGL (workstations) and All-in-Wonder (multimedia products). Its brand for notebook computer discrete products is Mobility Radeon. ATI's chipset products are targeted to motherboard manufacturers and OEMs, and include the Radeon Xpress 200 integrated chipsets for the desktop and notebook markets and the Radeon Xpress CrossFire Edition chipsets designed to be used in conjunction with one or more discrete graphics chips in graphically demanding applications such as gaming.

23. In its consumer segment, ATI's products are designed to provide advanced visual and audio processing for color mobile phones and other handheld devices, and include ATI's Imageon product line. With respect to digital television, ATI's Xilleon and Theater products are highly integrated visual and signal processing solutions offered to DTV and set-top box manufacturers. In the game console market, the Microsoft Xbox 360 and Nintendo GameCube both utilize ATI's products.

24. ATI sells its products through various channels and to customers including OEMs; system integrators who build ATI's products into their PCs; original design manufacturers who add ATI's products to their PC motherboard products or graphic board products; and both traditional and online distributors and retailers.

25. The market for the manufacture and sale of Graphics Processing Units and Cards is conductive to the type of collusive activity alleged here. That market is oligopolistic in nature.

26. The market for the manufacture and sale of Graphics Processing Units and Cards is subject to high manufacturing and technological barriers to entry. Efficient fabrication plants are large and costly. Graphics Processing Units and Cards are also subject to technological advances, so that firms within the industry must undertake significant research and development expenses.

27. The Graphics Processing Units and Cards industry has also been subject to significant consolidation during the Class Period.

28. Defendants sell their Graphics Processing Unites and Cards through various channels including to manufacturers of electronic products and devices, and to resellers of Graphics Processing Units and Cards. These electronic products and devices and Graphics Processing Units and Cards are then sold, directly or indirectly, to consumers and are not altered during the course of sale.

7251

29.    California is the largest market in the world for Graphics Processing Units and Cards and is the worldwide center of the PC industry and other industries that depend upon the Graphics Processing Units and Cards markets. Statements concerning the prices and market conditions for Graphics Processing Units and Cards were disseminated by Defendants from and into California on a regular and continuous basis.

### DEFENDANTS' ILLEGAL CONDUCT

30.    On November 30, 2006, Defendant AMD announced that it "has received a subpoena from the U.S. Department of Justice ("DOJ") Antitrust Division in connection with the DOJ's investigation into potential antitrust violations related to graphics processors and cards." (<http://www.amd.com/us-en/Corporate/VirtualPressRoom/0,,51_104_543-114493,00.html>) AMD further stated that "AMD entered the graphics processor business following the company's acquisition of ATI Technologies, Inc. last mouth (October 25, 2006)." *Id.*

31.    On November 30, 2006, Defendant Nvidia announced that it "has received a subpoena from the San Francisco Office of the Antitrust Division of the Department of Justice in connection with the DOJ's investigation into potential antitrust violations related to Graphics Processing Units and Cards." (<http://phx.corporate-ir.net/phoenix.rhtml?c =116466&p=irol-newsArticle&ID =937753&highlight= >).

32.    One report in the December 1, 2006 edition of the San Jose Mercury News indicated: "[t]he Department of Justice investigators asked Nvidia for pricing documents, customer agreements and other documents, company spokesman Michael Hara said Friday. 'They have asked for a pretty big data dump that goes back to the late '90s," Hara said. "It's a fairly broad request.'"

7251

(<http://www.mercurynews.com/mld/mercurynews/business/technology/16143619.htm>) A December 2, 2006 article in the San Francisco Chronicle expanded on Mr. Hara's remarks; "Michael Ham, vice president of corporate communications at Nvidia, said the Justice Department requested documents going back eight or nine years. 'It's a broad range of documents relating to customers, competitors, product stack, prices, market studies -- everything, pretty much,' he said."
(<http://www.sfgate.com/cgi-bin/article.cgi?file=/chronicle/archive/2006/12/02/BUGTFM NRS81.DTL&type=business>).

33. In a report it was stated that "Gina Talamona, a spokeswoman for the DOJ, said the agency is looking into possible anticompetitive practices within the 'graphics processing unit and cards' industry."
(<http://news.com.com/Justice+Dept.+subpoenas+AMD%2C+Nvidia/2100-1006 3-6140041.htm1?tag =st lh>).

34. Regular users of Nvidia and ATI graphics cards have voiced suspicions of price-fixing collusion between the two companies in recent years. (<http://episteme. arstechnica.com/eve/forums/a/tpc/f/174096756/m/340003858631/inc/1>).

35. One commentator has compared the DOJ's investigation of Graphics Processing Units and Cards to its successful prosecution of manufacturers of Dynamic Random Access Memory ("DRAM"), which has resulted in $731 million in criminal fines: "'If the DOJ wanted to, it could just go down every line in the semiconductor industry and find the same issue," said Gartner Inc. analyst Richard Gordon. "That's because there are a relatively few number of suppliers in the chip industry and an open flow of communication between competitors and customers, who may not define price fixing the same way the DOJ does," he said.

7251

(<http://www.computerworld.com/action/article.do?command =viewArticleBasic&taxonomy Name =govermnent&articleId =9005596&taxonomyId=13&intsrc=kc_top >). Similarly, in The San Francisco Chronicle article cited previously, "Crawford Del Prete of International Data Corp. said the investigation is not surprising. 'I am not surprised that (the Justice Department) is looking *into this as* there are few suppliers left, which aggregates pricing power,' he said in an e-mail."

36. Other news reports contained similar comments by analysts. The San Jose Mercury News article quoted above had this to say: "'I have to believe this stuff traces back into history,' said Doug Freeman, an analyst with American Technology Research. 'As a consumer, I have noticed that the price points of video cards have always been pretty equal. The first mover comes out with a product that is $500 and the follower comes out with a product that is $500. They tend not to be in price wars.' Ashok Kumar, an analyst with Raymond James, said the Justice Department was possibly alerted by customers, such as PC makers or the so-called white-box clone PC makers based in Taiwan who try to keep their prices as low as possible. 'The question is, do prices fall with the normal trajectory of the costs?' Kumar said."

37. Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which was to raise the prices at which they sold Graphics Processing Units and Cards to artificially inflated levels.

38. Defendants, through their officers, directors and employees, effectuated the aforesaid contract, combination, trust or conspiracy between themselves and their co-conspirators by, among other things:

    a. Participating in meetings and conversations, including through various

7251

        trade associations and committees, to discuss the prices of Graphics Processing Units and Cards in the United States;

    b.    Agreeing, during those meetings and conversations, to charge prices at specified levels and otherwise to increase and maintain prices of Graphics Processing Units and Cards sold in the United States;

    c.    Issuing price announcements and quotations in accordance with the agreements reached; and

    d.    Selling Graphics Processing Units and Cards to various customers in the United States at non-competitive prices.

## ACTIVE CONCEALMENT

39.    Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiffs. Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this class action litigation was commenced.

40.    As a result of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

7251

## VIOLATIONS ALLEGED

### First Claim for Relief

**(Violation of Section 1 of the Sherman Act)**

41. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

42. Beginning at a time presently unknown to Plaintiffs, but at least as early as November 30, 2002 and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Graphics Processing Units and Cards in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

43. In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

   a. To fix, raise, maintain and stabilize the price of Graphics Processing Units and Cards;

   b. To allocate markets for Graphics Processing Units and Cards among themselves;

   c. To submit rigged bids for the award and performance of certain Graphics Processing Units and Cards contracts; and

   d. To allocate among themselves the production of Graphics Processing Units and Cards.

7251

44. The combination and conspiracy alleged herein has had the following effects, among others:

    a. Price competition in the sale of Graphics Processing Units and Cards has been restrained, suppressed, and/or eliminated in the United States;

    b. Prices for Graphics Processing Units and Cards sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

    c. Those who purchased Graphics Processing Units and Cards directly or indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

45. Plaintiffs have been injured and will continue to be injured in their business and property by paying more for Graphics Processing Units and Cards purchased indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy, including paying more for personal computers and other products in which Graphics Processing Units and Cards is a component as a result of higher prices paid for Graphics Processing Units and Cards by the manufacturers of those products.

46. Plaintiffs and the class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## Second Claim for Relief

**(Violation of South Carolina Consumer Protection and Unfair Competition Laws)**

47. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

7251

48. By reason of the foregoing, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Carolina Code Laws §39-5-10 *et seq.*.

49. As a result, class members in South Carolina paid supra-competitive, artificially inflated prices for Graphics Processing Units and Cards. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business and property insofar as they paid more for Graphics Processing Units and Cards than they otherwise would have paid, but for the Defendants' unlawful conduct.

### Third Claim for Relief

**(Unjust Enrichment and Disgorgement of Profits)**

50. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

51. Defendants have been unjustly enriched through overpayments by Plaintiffs and Class members and the resulting profits.

52. Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and Class members.

53. Plaintiffs seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A. That the Court determine that the Sherman Act, state antitrust law, and common law claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

7251

  B. That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

    a. A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

    b. A violation of the South Carolina state consumer protection law identified in the Second Claim for Relief herein;

    c. Acts of unjust enrichment as set forth in the Third Claim for Relief herein.

  C. That Plaintiffs and the Class recover damages, as provided by federal and state antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with such laws;

  D. That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and (2) communicating or causing to be communicated to any other person engaged in the sale of Graphics Processing Units and Cards, information concerning bids of competitors;

  E. That Plaintiffs be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

F.      That Plaintiffs and members of the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.      That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.      That Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury for all issues so triable.

Dated: March 26, 2007                  Respectfully submitted,

/s/ W. H. Bundy, Jr
W. H. Bundy, Jr., Fed. Ct. ID #1598
**Smith, Bundy, Bybee & Barnett, P.C.**
Building F, Suite 100
1037 Chuck Dawley Boulevard
Mount Pleasant, SC 29464
(843) 881-1623

Garrett D. Blanchfield
Mark Reinhardt
**Reinhardt Wendorf & Blanchfield**
E-1250 First Nat'l Bank Building
332 Minnesota Street
St. Paul, MN 55101
(651) 287-2100

*Counsel for Plaintiffs*

7251

20